## E. W. DETTIS AND ANOTHER v. WESTERN UNION TELEGRAPH COMPANY.[1]

January 10, 1919.

No. 21,002.

**Telegraph company sending interstate messages — filing tariffs.**

1. A telegraph company engaged in transmitting interstate messages is not required to file copies of its regulations and tariffs with the Interstate Commerce Commission by virtue of the provisions of the Interstate Commerce Act.

[1]Reported in 170 N. W. 334.

**Same — notice to sender.**

2. Notice of such regulations is not to be imputed to the sender of an interstate message solely by reason of the fact that the company has voluntarily filed them with the commission.

**Same — discrimination.**

3. No discrimination in the rates charged for an interstate message arises from the fact that such message is written upon a telegraphic blank containing no restrictions upon the liability of the company for damages growing out of its negligent delay in transmitting such message, instead of the blank ordinarily supplied by the company for the use of its patrons in sending messages.

**Same — liability for delay.**

4. A telegraph company is liable for all the damages which result proximately to the sender of an interstate message written upon a blank containing no restrictions upon its liability, where such message is accepted but negligently delayed in transmission, provided such damages may reasonably be supposed to have been contemplated by the parties when the message was accepted as the probable result of such negligence.

**Same — notice of regulations — question for jury.**

5. Evidence considered and *held* to raise a question for the jury as to whether plaintiffs had notice of the regulations and terms printed on the back of defendant's blank forms ordinarily used in sending messages, and as to whether the company accepted the message here involved under an agreement with plaintiffs that its transmission should be delayed on account of wire trouble.

**Presumption as to law of foreign state.**

6. In the absence of pleading or proof as to the statutory law of another state, it is presumed that the common law in force in such state and the rights of the parties will be determined under its rules applicable thereto.

Action in the district court for St. Louis county to recover $520, damages caused by delay in transmission of a telegram. One defense set up in the answer was that the message in question was received and delivered subject to the terms of a certain written contract, one term of which was that defendant should not be liable for mistakes or delays in the transmission or delivery of messages or nondelivery of any unrepeated message, that the telegram in question was an unrepeated message, and another term of which was that defendant was not to be liable beyond the

sum of $50. Another defense pleaded is stated in the third paragraph of the opinion. The case was tried before Ensign, J., who when plaintiff rested denied defendant's motion to dismiss the action, and at the close of the testimony denied its motion for a directed verdict, and a jury which returned a verdict for $567.92. From an order denying its motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Affirmed.

*Thomas S. Wood, G. A. E. Finlayson, Albert T. Benedict* and *Cassius M. Ferguson,* for appellant.

*E. J. Kenny* and *J. T. Kenny,* for respondents.

LEES, C.

Plaintiffs, as copartners under the name of Joplin Grain Company, operated an elevator at Joplin, Montana, where they bought wheat, basing the prices paid for it on the Duluth or Minneapolis market, where the wheat was sold for them on the board of trade through grain brokers. Daily market quotations were furnished to them by the defendant by wire in the form of market letters known as C. N. D.'s. Martin H. Snippen was plaintiffs' agent at Joplin. In buying grain, Snippen based the purchase price on defendant's daily market letters which were delivered to him by L. R. Sherry, its agent at Joplin. In August, 1916, Snippen was making contracts with farmers in the vicinity of Joplin for wheat to be delivered in December. By Saturday, August 26, he had contracted for the purchase of 6,500 bushels. At 7:25 a. m. on the following Monday he went to defendant's office and wrote out and delivered to Sherry the following telegram:

"Joplin, Mont. 725 A Aug. 28, 1916 Randall Gee and Mitchell Co. Duluth Minn. Bought six thousand northern five hundred winter. Joplin Grain Co."

The company named as addressee was plaintiffs' agent to sell grain on their account on the board of trade at Duluth. Snippen testified that he asked Sherry to send the telegram immediately and told him it was important. He also testified that a few weeks before he had told him how plaintiffs were transacting their business at Joplin and the use they made of the C. N. D.'s, and the reasons for sending to their bro-

kers so-called sale messages similar to the one involved in this litigation. Sherry contradicted this testimony. In the transaction of its business defendant made use of a blank form of message called a "sending blank" and another form called a "receiving blank." On the back of the former there were printed certain terms and conditions which restricted the liability of defendant upon an unrepeated message, delayed in transmission, to the amount received for sending it, and fixed the value of a repeated message at $50, unless a greater value was stated in writing when it was offered for transmission and unless a small fee in addition to the usual charge was paid.

The telegram here involved was written on a receiving blank, for the reason that Sherry's supply of sending blanks had been used up, and the receiving form was the only one he had on hand. There are no conditions or restrictions of liability printed upon this form. It was in legal effect merely a blank sheet of paper. The telegram was not transmitted until 3:31 o'clock in the afternoon of August 28. Sherry explained the delay by testifying that the defendant's wires between Joplin and Helena were down from 7 a. m. to 3:30 p. m. and that he told Snippen when he accepted the telegram that he could not get it through because the wire was out of order. This was denied by Snippen. The message was received at Duluth at 4:55 p. m. The board of trade regularly closed for the transaction of business at 1:30 p. m. and until it reopened on the morning of the twenty-ninth no sale of the wheat could be made. If the message had been transmitted immediately after it was delivered to Sherry, it would have reached Duluth as early as 10 a. m. on August 28.

When the board of trade opened on August 28 wheat sold for December delivery at $1.55 per bushel. When it opened on August 29 the price had fallen to $1.47 per bushel. The wheat plaintiffs had contracted for was sold at the latter price at the opening of the market on that day. Alleging that defendant's delay in transmitting the message had resulted in the loss to plaintiffs of this difference in price, this action was brought to recover $520. By its answer defendant, among other defenses, specially pleaded that this was an interstate message, and that the amendment of June 18, 1910, to the Interstate Commerce Act (36 St. c. 309, pp. 539, 544, 545), had vested the Interstate Commerce Commission with exclusive jurisdiction over defendant insofar as such mes-

sages are concerned; and that, with knowledge of defendant's rates, classifications and practices, the commission had acquiesced in and approved of them. At the trial it offered in evidence a copy of its form of sending blank and of its tariff book and rules and regulations, with the certificate of the secretary of the commission that the same had been received and filed May 12, 1916. Plaintiffs' objection to the reception of either in evidence was sustained. The court instructed the jury that there was "no evidence * * * that the Interstate Commerce Commission had anything to do, or did anything, in relation to this matter," and defendant duly excepted.

There was a verdict for plaintiffs for the full amount sought to be recovered. Defendant made the usual alternative motion for judgment notwithstanding the verdict, or, that being denied, for a new trial. The motion was denied. This appeal followed.

The first question to be considered is whether the trial court erred in ruling out the copies of defendant's form of sending message and tariff book and rules filed with the Interstate Commerce Commission and in charging the jury in the language above quoted. If we correctly understand the argument of counsel for defendant, their two chief contentions are: First, that after May 12, 1916, anyone sending an interstate message over the lines of defendant was chargeable with knowledge of the conditions and restrictions printed on the back of its blank form for sending messages and was bound thereby, even though the message when accepted for transmission was written on a blank sheet of paper, and that the case must be disposed of as though plaintiffs' message had been written on the regular form of sending blank; and, next, that to permit a recovery of an amount in excess of the charge for sending an unrepeated message would give to plaintiffs an advantage over other persons sending similar messages written upon defendant's blank sending form and so result in a violation of the Interstate Commerce Act requiring uniform rates to be charged for each of the several classes of messages.

1. This act, as first adopted in 1887, was amended June 18, 1910 (36 St. 539, c. 309). As amended its application is extended to telegraph companies sending messages from one state to another. The amendment provides [pp. 545, 546] that telegraph messages may be classified and

different rates charged for the different classes of messages, and that the commission may correct any rate, charge, classification, regulation or practice which it finds to be unjust, discriminatory or preferential, and prescribe the rate, classification, regulation or practice which shall thereafter be followed.

Durre v. Western Union Tel. Co. 165 Wis. 190, 161 N. W. 755, was an action for damages for negligence in delivering a telegram. In the course of its opinion the court said:

"There must be filed by such company with the Commission created by the act and kept open for public inspection schedules showing all its charges, rules, regulations and practices."

In Gardner v. Western Union Tel. Co. 231 Fed. 405, 145 C. C. A. 399, an action brought to recover damages for delay in delivering a message directing the purchase of broom corn, the court said:

"As to their interstate business, telegraph companies must print and publish their rates, rules, classifications, regulations and practices, and file same with the Interstate Commerce Commission."

On the other hand, in Cultra v. Western Union Tel. Co. 44 I. C. C. R. 670, the Interstate Commerce Commission interpreted the statute, and particularly section 6 thereof, which deals with the form and manner of filing, publishing and posting the schedules of rates and charges, and the rules and regulations of common carriers, as applying only to carriers engaged in the transportation of passengers or property. Speaking of this section, the commission said:

"Its terms are too definite to permit us to extend their application by construction to telephone and telegraph companies; and, although the rates, charges, rules and regulations of such companies may be stated more briefly perhaps, and with less expense than the rates and regulations of any other class of carriers under our jurisdiction, we have not felt, as stated in our annual reports to the Congress for 1911 and subsequent years, that authority has been given to the Commission under section 6 to require such companies to comply with its provisions when fixing and establishing their rates and charges. The * * * Western Union Telegraph Company has nevertheless voluntarily filed with the Commission its tariff book, containing the bases of its rates, and charges, as well as its rules, regulations, blanks, and other matters relating to

the service it undertakes to perform for the public; but so far as the specific requirements of section 6 are concerned, the rates, charges, rules and regulations of telephone and telegraph companies may be and customarily are established and offered to the public without first being published and posted with the Commission, a procedure that must be observed by all other carriers under our jurisdiction before they may lawfully offer their services to the public or legally effect changes in their rates and practices."

The conclusion of the commission was that section 6 of the act does not apply to telephone and telegraph companies. It seems to us that the interpretation adopted by the administrative body having the enforcement of the act in charge should control until a different interpretation is announced by the Supreme Court of the United States, and that the two cases first above cited, insofar as the views they express conflict with the subsequent opinion of the commission, are no longer to be regarded as authorities in support of defendant's position. In deference to the interpretation placed upon the act by the commission, we hold that defendant was not required to file its form of sending blank or tariff book with the commission.

If it was not required to do so, is the fact that it voluntarily filed them of any consequence?

In Ford v. Chicago, R. I. & Pac. Ry. Co. 123 Minn. 87, 143 N. W. 249, plaintiff sued to recover for the loss of baggage delivered to defendant to be transported from a station in Kansas to one in Minnesota. The answer of the defendant set out its regulations for the transportation of baggage, which had been filed with its schedules with the Interstate Commerce Commission. Such regulations limited the recovery in such a case to $100, unless a greater value was declared by the passenger at the time of checking his baggage. Plaintiff had no actual knowledge of the regulations and did not consent to the limitation they impose. This court held that they fixed the limit of the company's liability and bound the passenger whose baggage was being transported from one state to another, and refused to follow the decision of the supreme court of Massachusetts in Hooker v. Boston & Maine R. 209 Mass. 598, 95 N. E. 945, Ann. Cas. 1912B, 669.

The Hooker case subsequently went to the Supreme Court of the

United States, 233 U. S. 97, 34 Sup. Ct. 526, 58 L. ed. 868, L.R.A. 1915B, 450, Ann. Cas. 1915D, 593, where it was finally held that a passenger who checked her baggage from Boston to a station in New Hampshire, to be transported in interstate commerce, was not entitled to recover its value, though it was lost through the negligence of the railroad company, and that her recovery was limited to $100 in view of the regulations made by the company concerning the transportation of baggage and filed with the Interstate Commerce Commission, although no notice thereof, other than the notice presumed from the filing and posting of its schedules, had been given to the passenger. In the course of the opinion in that case it was said, that if it be found that the limitation of liability for baggage is required to be filed in the carrier's tariffs, the plaintiff was bound by such limitation, and that she was presumed to have the notice which follows from the filed and published regulations as required by the statutes and the order of the Interstate Commerce Commission.

If the Act of Congress of June 18, 1910, as interpreted by the commission, required a telegraph company to file its schedules and regulations as railroad companies are required to file theirs, these decisions would be applicable to the case in hand and the order of the trial court could not be sustained. But, since the act does not require this to be done, we conclude that notice of the regulations established by defendant is not to be imputed to plaintiffs merely because it chose to deliver them to the commission for filing. The recording acts of most states require conveyances of real estate to be filed for record in some public office, and provide that the record thereof shall be notice to the public. In an early case involving the recording act of this state, it was held that the record of an instrument, not authorized to be recorded either from the nature of its subject matter or a defect in its execution, is a nullity and is not notice for any purpose. Parret v. Shaubhut, 5 Minn. 258 (323), 80 Am. Dec. 424. The same question was considered in Burck v. Taylor, 152 U. S. 634, 14 Sup. Ct. 696, 38 L. ed. 578, and the conclusion reached that the filing of an instrument for record in a public office, where the statutes of a state make no provision for the record of such an instrument, carried with it no notice to those not parties to the instrument. We think this principle is applicable here, and that Snippen is not to

be deemed to have had notice of or to have sent the message subject to defendant's regulations, from the mere fact that it had voluntarily filed them with the Interstate Commerce Commission.

2. Defendant's counsel has argued vigorously that if it is held that a person who writes a telegram on a blank sheet of paper may recover unlimited damages for delay in its transmission, while he could only recover limited damages if it had been written on the usual sending form, the provisions of the Federal statute requiring uniformity of rates are violated, and discriminations would result in favor of those who might be permitted, through the connivance of an unfaithful agent, to send messages not written on forms restricting the company's liability. The statute provides that telegraph messages may be classified into day, night, repeated, unrepeated, letter, commercial, press, government and such other classes as are just and reasonable, and different rates may be charged for the different classes of messages. This statute is not violated by permitting a recovery of damages to a greater amount in case a day message, such as we have before us here, is accepted for transmission when not written on a sending form, than could be recovered had it been written on such form. Plaintiffs were charged the same rate for the transmission of this message as would have been charged had it been written on the ordinary sending blank. There was no discrimination in plaintiffs' favor as to rates. The only advantage they derived from the acceptance by defendant for transmission of the message, written as it was on a receiving instead of a sending blank, was that they did not thereby restrict themselves to the recovery of limited damages in case it failed to transmit and deliver the message with reasonable dispatch.

This point was touched upon in Sullivan v. Minneapolis & R. R. Ry. Co. 121 Minn. 488, 142 N. W. 3, 45 L.R.A.(N.S.) 612. In that case the defendant contended that a recovery of damages resulting to plaintiff from an unlawful discrimination against him in rates would, in effect, fix a lesser rate than that established by law. In disposing of this contention this court said [p. 503]:

"Only one wrong is here and can be involved, and that is the discrimination, and it is counterfeit logic to assert that the restoration of the equality of rates commanded by the law and the statutes by recovery

of the difference involved in the discrimination, is in any true sense a fixing of a rate or an interference with one previously established. How can an action for damages instituted and tried after the completion of the shipments involved and the full payment of the charges fixed by law be deemed to be an interference· with the established rates? The legal rates remain the same, regardless of the infraction of the law complained of, and can in no way be affected by the final outcome of this action; and a judicial readjustment of matters between the parties hereto by an allowance of the most obvious damages which the plaintiffs have suffered from the defendant's violation of the law, cannot be held to be a wrong. * * * The legal rates before and during and after the wrong sued for are unaffected."

3. We recognize the fact that the Act of Congress of June 18, 1910, occupies the entire field and has taken complete control of the interstate business of telegraph companies insofar as state statutes or the common law may be in conflict therewith, but we have searched in vain for any Federal decision holding that the liability of a telegraph company for damages for negligence in transmitting or delivering a message is restricted where the message is written on a blank sheet of paper. In the Cultra case the message was written on a telegraph blank, bearing upon its face in clear, bold type the words: "Send the following night letter subject to the terms on the back hereof which are hereby agreed to." In Gardner v. Western Union Tel. Co. 231 Fed. 405, 145 C.C.A. 399, and in Williams v. Western Union Tel. Co. 203 Fed. 140, the same form of blank was used. Most of the cases cited in appellant's brief from the decisions of state courts involved messages written on blank forms, having the restricted liability clause printed thereon. See Western U. T. Co. v. Hawkins, 198 Ala. —, 73 South. 973; Boyce v. W. U. T. Co. 119 Va. 14, 89 S. E. 106; and Haskell v. Postal Tel. Cable Co. 114 Me. 277, 96 Atl. 219.

In this connection the question arises whether the condition that a telegraph company shall not be liable upon an unrepeated message beyond the amount paid for its transmission applies to a case such as this where the message was correctly transmitted. The fault with which defendant is charged consists solely in its delay in transmitting the message. A repeated message is one telegraphed back to the sending office

for comparison. Obviously a message cannot be repeated until it has been received at its destination. The object of repeating it is not to guard against delays, but mistakes in transmission. This was held in Francis v. Western Union Telegraph Co. 58 Minn. 252, 59 N. W. 1078, 25 L.R.A. 406, 49 Am. St. 507, as applied to a case where the company wholly failed to transmit a message, and we see no difference in principle between a failure to transmit and an unreasonable delay in transmitting a message insofar as its repetition is concerned. Numerous cases sustain this view. See Box v. Postal Tel. Cable Co. 165 Fed. 138, 91 C.C.A. 172, 28 L.R.A.(N.S.) 566, and note. In this aspect of the case, even though it were conceded that plaintiffs are in the same position as though Snippen had written the message on one of defendant's sending forms, defendant would still be liable for all the damages which resulted to plaintiffs through the delay in transmitting it.

4. The theory upon which it is held that liability for damages in this class of cases is limited to the amount fixed by the regulations of the company, rests on the assumption that there is a contract between it and the sender of the telegram restricting the former's liability; that such contract is found in the printed terms on the back of the telgraphic blank in ordinary use, and that such terms are binding so far as they are reasonable. Cole v. Western Union Tel. Co. 33 Minn. 227, 22 N. W. 385; Primrose v. W. U. T. Co. 154 U. S. 1, 14 Sup. Ct. 1098, 38 L. ed. 883. We do not mean to say that such contract may not be made out quite apart from the company's telegraphic blanks. At the trial evidence was introduced by defendant to show that Snippen knew that there were printed terms on the back of defendant's sending forms, and that he intended to send this particular message in the ordinary way as a "straight telegram," as he termed it. It is argued that this evidence conclusively shows that he had notice of the terms appearing on the back of the sending blanks. We hold that the evidence as to this feature of the case was not conclusive, but raised a question for the jury to determine whether Snippen had knowledge of the terms mentioned. Carland v. W. U. T. Co. 118 Mich. 369, 76 N. W. 762, 43 L.R.A. 280, 74 Am. St. 394; Jones, Telegraph Companies, §§ 424, 425.

5. This brings us to a consideration of the other question involved in this appeal. If the defendant is liable to plaintiffs, the extent of such

liability is to be ascertained in accordance with the rules of the common law. The contract was made in Montana. There is no pleading or proof as to the statutes of that state, and in such cases it is presumed that the common law on the subject is in force. Kolliner v. Western Union Tel. Co. 126 Minn. 122, 147 N. W. 961, 52 L.R.A.(N.S.) 1180. There was evidence in the case sufficient to justify the jury in finding that, from previous dealings and conversations between plaintiffs' agent Snippen and defendant's agent Sherry, defendant knew of the manner in which plaintiffs transacted their business of dealing in grain and the purpose of the message in question. We think plaintiffs were entitled to recover to the extent of their actual loss proximately resulting from defendant's failure to transmit the message with reasonable promptness. This court has adopted the familiar rule laid down in Hadley v. Baxendale, 9 Exch. 341, in determining the plaintiffs' right to recover damages in such a case as this. Beaupre v. Pacific & A. Tel. Co. 21 Minn. 155.

6. The burden of explaining and justifying its delay in transmitting the message rested upon the defendant. Under proper instructions from the court and upon evidence sufficient to warrant their finding, the jury, by their verdict, found that defendant had failed to do so. Whether Snippen and Sherry, at the time the message was accepted, agreed that its transmission should be delayed because defendant's wires were out of order, and whether Snippen, although he wrote the message on a receiving instead of a sending blank, intended or agreed that defendant's liability for damages for negligence should be restricted in the same manner as though he had written the message on a sending blank, were questions for the jury, and the verdict, approved as it was by the trial court, cannot be disturbed on the ground that it is not justified by the evidence. Questions raised by other assignments of error have been examined. We find nothing in them requiring discussion. Our conclusion is that the order appealed from should be affirmed, and it is so ordered.