WESTERN UNION TELEGRAPH COMPANY *v.* GRAHAM.

REGULATIONS BY TELEGRAPH COMPANY *respecting their business.* Telegraph companies may make reasonable regulations concerning their business, but cannot by such rules relieve themselves from responsibility for the negligence of their servants.

REGULATION *not applicable.* That the plaintiff did not cause a message to be repeated as required by a regulation of the company is no *defense* to an action for a failure to deliver the message after it was received at the office to which it was addressed.

MEASURE OF DAMAGES *in action for non-delivery of telegram.* In an action against a telegraph company to recover damages for the non-delivery of a telegram, in which the plaintiff requested his agents at Nebraska City to "ship oil soon possible," the plaintiff cannot recover the profits which he might have made on the oil if the message had been delivered and the oil sent in due time.

*In such action* the plaintiff may recover the money paid by him for transmitting the message, the advance in the price of freight, and his expenses incurred by reason of the failure of the defendant to fulfill the contract.

*Error to District Court, Arapahoe County.*

HALLETT, C. J., did not participate in the decision.

Mr. ALFRED SAYRE, for plaintiff in error.

Messrs. CHARLES & ELBERT, for defendant in error.

BELFORD, J.   The marked ability which has character-
ized the argument of this case makes it important to exam-
ine with great care the principles involved.   The declaration
contains three counts.   It is averred that the plaintiff, on
the 5th day of December, 1864, employed the defendant to
transmit from Denver, in Colorado, and deliver to Ashton
and Tait, in Nebraska City, in Nebraska, the following mes-
sage :

"DENVER, *December* 5, 1864.
"ASHTON & TAIT, *Nebraska City :*
   "Ship oil soon as possible, at very best rates you can.
                          "WILLIAM GRAHAM."

It is further alleged that, in consideration of the sum of
$5.00 then paid, the defendant accepted and agreed to
deliver the same, but that, by reason of the unskillfulness,
negligence, and want of care of the servants and employees
of the company, the message was not transmitted and
delivered ; by means whereof the said Ashton and Tait did
not ship the oil as requested, and the plaintiff was com-
pelled to pay higher rates of freight on the same, amount-
ing to the sum of $500, and also that the plaintiff lost great
gains and profits by the delay thus caused in not shipping
said oil, amounting to the sum of $1,500, and was other-
wise put to great expense and incurred great loss and dam-
age.

The defendants, for answer, plead the general issue, and
four special pleas.   In the special pleas it was alleged, that
at the time of the delivery of the several telegraphic messa-
ges, in the several counts of the declaration mentioned, the
plaintiff was notified and informed that in order to guard
against mistakes in the transmission of messages over the

lines of the defendants from Denver to Nebraska City, every message of importance ought to be repeated by being sent back from the station at which it is to be received to the station from which it is originally sent, and that the defendant would charge fifty per cent more for repeating each message than for sending or transmitting such message without repeating the same ; and that, while the defendant would use every precaution to insure correctness, the said defendant would not be responsible to the plaintiff or to any other person for mistakes or delays in the transmission or delivery of repeated messages, beyond an amount exceeding five hundred times the amount paid for sending the message, and that the said defendant would not be responsible for mistakes or delays arising from interruptions in the working of the telegraph of the said defendants, nor for any mistake or omission of any other company over whose lines a message should be sent to reach the place of destination.    It is further alleged that the plaintiff, well knowing the premises, did not, at the time of delivering the messages, in the declaration mentioned, to the defendant, nor at any time before or since, request the defendant to repeat the messages by sending the same back from Nebraska City to Denver, nor did the plaintiff pay or offer to pay to the defendants the sum or price charged by the said defendants for repeating the said several telegraphic messages.    To these several special pleas a demurrer was filed and sustained.    The defendant went to trial on the general issue, and the jury returned a verdict for the plaintiff, and assessed his damages at $1,039.69.    The motion for a new trial having been overruled, the cause comes here.

The first error assigned is the sustaining of the demurrer to the special pleas.

It is claimed by the plaintiff in error that Graham, having subscribed to the conditions printed on the back of the paper on which the dispatch was written, is not only chargeable with notice of them, but that his right to recover is limited thereby.    It is further insisted that, not having requested the defendant to repeat the message, he thereby

released the company from liability. It is no longer a question of doubt that a telegraph company has the right to make reasonable rules and regulations for the proper conducting of its ordinary telegraphing business, and this right has been recognized by many of the States by statutory enactments, and in others by decisions of their courts, but while this is the case, the doctrine has nowhere been carried to the length of exempting them from all responsibility for a want of fidelity and care in the exercise of the employment which they undertake to prosecute. There are duties they owe the public arising out of the nature of their employment which it would be impolitic and inexpedient to suffer them to diminish or evade. Among these duties may be mentioned the obligation to employ competent and skillful operators and other agents and servants, in all respects competent for the discharge of their particular duties; and further, to see that they not only possess such skill, but that it is continually applied in the particular business in which they are engaged. They cannot refuse to receive and forward messages, nor select the persons for whom they will act. They must send for every person who may apply at a uniform rule without any undue preference, and according to established rules and regulations applicable to all alike. In the case of *Ellis* v. *American Telegraph Company*, 13 Allen, 234, BIGELOW, C. J., says: "There can be no doubt that in the ordinary employments and occupations of life men are bound to the use of due and reasonable care, and are liable for the consequences of carelessness or negligence in the conduct of their business to those sustaining loss or damage thereby. We can see no reason why this rule is not applicable to the business of transmitting messages by telegraph. But the rule does not operate so as to prevent parties from prescribing reasonable rules and regulations for the management of the business, or establishing special stipulations for the performance of services, which, if made known to those with whom they deal, and directly or by implication assented to by them, will operate to abridge their general liability at common

law, and to protect them from being held responsible for unusual or peculiar hazards which are incident to particular kinds of business. Of course a party cannot in such way protect himself against the consequences of his own fraud, or gross negligence, or the fraud or gross negligence of his servants or agents, nor can he escape all liability or responsibility in the performance of the service or duty which he undertakes. Nor can there be any difficulty or danger in the application of this principle so long as it is kept within a proper limit. That limit is found by requiring in all cases that the conditions and regulations by which a party seeks to limit his liability in the conduct of his business shall be reasonable. Such only, by the rules of law, can a party be permitted to prescribe, and to none other can those who deal with them be held to yield their assent."

This brings us to the question, whether the rule relied on by the defendants in the special pleas, and which is set up in defense of the plaintiff's claim, is a just and reasonable one, and such as they have a right to prescribe, and by which the plaintiff was bound.

It has been remarked by an eminent lawyer, " that when rules and regulations are in derogation of common right, or are intended to restrict and limit liabilities to which the company would otherwise be subject, by reason of the duties imposed upon it by law, or the nature of its engagement, the validity of such rules and regulations is a question of law." Accepting this as true, how stands the rule relied upon in the special plea? The gist of the action is the failure to deliver the message. The complaint is not that the message was incorrectly sent or that it was inaccurately taken off the wires at Nebraska City. If this was the gravamen of the action, we might hold with the Kentucky and Massachusetts courts, that it was the duty of the plaintiff to insure its accuracy by having it repeated. But how could the failure to deliver the message be avoided by paying for having it repeated? Can it be said that the operator at the other end of the line could insure the safe delivery of a message by repeating, when the negligence which

occasioned the failure occurred after the receipt of the message? The object of repeating a message is to correct errors and not to avoid delays in delivering it. After transmission an incorrect message could be sent out and delivered as speedily as if it had been verified and proved to be perfectly accurate. Delays in the delivery of a message result from causes altogether different from those which produce mistakes in transmission, and it is reasonable that rules of limitation or exemption should be adapted to the nature of the case. Scott and Jarnigan on the Law of Telegraphs, § 113. A message may be correctly transmitted from one point to another, may be correctly taken off the line, and the agent of the company may, through inattention, fail to deliver it to the party to whom it is directed. It would hardly be contended that in this case the company could shield itself under the condition that the party sending the message failed to pay for having it repeated. The mere fact of having it repeated could not have insured its delivery. The failure to deliver is not caused by imperfection of instruments and appliances, by electrical changes, or by a break of the line at an intermediate point, but by the negligence of the operator, and against this inattention and want of care these rules and regulations cannot provide. To support the reasonableness of the conditions attached to the message, our attention has been called to the case of *Ellis* v. *American Telegraph Company*, noticed above. The counsel citing this case must have overlooked the remarks of the chief justice, on page 238 : "It is hardly necessary to say that the question, whether the mistake or error in the dispatch would have been prevented or corrected by the repetition of the message, in conformity to the regulations established by the defendants, does not appear to have arisen at the trial. Whether it would have done so was a question of fact for the jury. *Of course the defendants would be liable for any negligence causing damage, which would not have been prevented by a compliance with these rules.*"

Until the plaintiff in error can show that the failure to

transmit and deliver the message could have been prevented by having it repeated, the above case can be of little avail to him. The next authority relied on is that of *Camp* v. *Western Union Telegraph Company*, 1 Metc. (Ky.) 166. In this case the company, by way of defense, relied upon a notice of the terms and conditions on which messages were received by it for transmission, and which are the same as those relied on here. SIMPSON, Judge, says : " There is no allegation in the plaintiff's petition that the mistake was occasioned by negligence, or was the result of incompetency or want of proper skill on the part of the agents who were employed by the company to act as operatives in the sending and receiving of dispatches ; *but the failure of the company to comply with its contract to transmit the message correctly is alone relied upon as the foundation of the plaintiff's right to a recovery in the action.*" It will be observed that the case at bar and the case cited differ in other particulars. Here the plaintiff charges that failure to transmit and deliver the message was occasioned by "the carelessness, negligence and want of skill of the defendants and their agents, and through want of due care and attention to their business." Here the act complained of is the failure to deliver the message, while in the case cited the message was transmitted and delivered, but there was a mistake made in the tenor of the dispatch, making it read sixteen cents a gallon instead of fifteen cents, as written by the sender. While we hold that it is competent for the company to provide by rules and regulations against the unforeseen disarrangement of electrical apparatus and the imperfection necessarily incident to the transmission of signs and words by electricity, yet it must be conceded that these forces or accidents do not affect the ability of the company to deliver the message to the party addressed, after it has been taken off the wires and reduced to writing. What is needed to secure delivery is fidelity, and to this the company is bound in all messages. In the case of *Birney* v. *New York and Washington Telegraph Company*, 18 Md. 341, 342, the plaintiff delivered to the com-

pany's agent a message for transmission, which was wholly forgotten by the agent, and he neglected to send it at all. There was no repeating price paid by the plaintiff. It was held by the court that the company's notice, with regard to the repetition of messages, would not apply to a case of neglect, when no effort was made to put a message upon its transit. Much has been said about the peculiar hazards to which telegraph companies are exposed. It is said that "the operating apparatus of the telegraph leaves no record of the work done at the place from which it is transmitted, and that, therefore, there is peculiar liability to error in the non-transmission and transmission of dispatches." This is all true, and courts and legislatures have been liberal in allowing companies to provide against such risks as arise out of atmospheric influences and kindred causes. At this point they have properly stopped. To permit them to contract against their own negligence would be to arm them with a most dangerous power, one, indeed, that would leave the public almost entirely remediless. It must be borne in mind that the public have but little choice in the selection of the company which is to perform the desired service. They do not select their agents or employees, nor can they remove them. They are bound to take the company as they find it, and to commit to these agents their messages, however valuable they may be. Such being the case, public policy as well as commercial necessity require that companies engaged in telegraphy should be held to a high degree of responsibility. I have thus far examined this case on the pleadings without alluding to the evidence elicited on the trial, and am of the opinion that the court below committed no error in sustaining the demurrer to the special pleas. Another question equally important remains for decision. On the trial below the court permitted the plaintiff, over the objection of the defendant, to introduce evidence of the price of coal oil in Denver, in December, 1864, and in January, February and March, 1865.

The introduction of this evidence was, doubtless, permitted on the ground that the plaintiff had a right to recover

damages for the loss of profits he might have made, had the
dispatch been delivered to Ashton and Tait; and the oil
been shipped by them and reached Denver in January or
February. It is claimed by the plaintiff in error that the
court also erred in giving the following instruction: "If the
jury believe from the evidence that the defendant made an
effort, in good faith, to transmit the dispatch given in evi-
dence, and that the same was transmitted from Denver to
Nebraska City, but that the dispatch was not delivered to
Ashton and Tait, by reason of the carrier of the defendant
depositing the same in the post-office at Nebraska City, then
the jury are instructed that the defendant was not guilty of
willful neglect or negligence, and the plaintiff is not entitled
to exemplary damages or "smart money," but is only enti-
tled to such reasonable damages as he sustained by the dif-
ference in freight, and the difference in price for which he sold
his oil, and the price for which he might have sold it had
the dispatch been delivered in time and the oil shipped at
the next opportunity, that Ashton and Tait had to ship
the oil after they should have received the dispatch." The
plaintiff in error rests his objection to the introduction of
the evidence above referred to, on the ground that the plain-
tiff's declaration contained no special averment of the loss
of profits. In an action for refusing to let a lessee into
possession, the plaintiff gave evidence of injury to his wife's
business as a milliner, without having averred it specially;
but the court held it admissible under the general allegation
of damage, as going to show that "the plaintiff had sus-
tained inconvenience." *Ward* v. *Smith,* 11 Price, 19; see,
also, *Shepard* v. *Milwaukee Gas Company,* 15 Wis. 327.
Before proceeding to discuss the right of the plaintiff to
recover damages for loss of profits, it is proper to remark
that neither the message nor declaration discloses the kind
of oil that was to be shipped, nor its quantity nor quality,
nor where it was at the date of the dispatch, nor for what
purpose such shipment was to be made, nor whether such
oil was intended for sale or for use, nor at what point the
profits were lost. For any thing that appears in the declara-

tion it might have been hair oil, fish oil, or wizard oil.   The element of certainty has been left out.   True, the evidence shows that the plaintiff had on deposit with Ashton and Tait, as his forwarding agents, sixty-nine boxes of coal oil, but nothing of this kind appears in the declaration.   Under the general averment, that the plaintiff lost profits on oil, it is claimed that the company should come prepared to dispute at the trial the value of any kind and any quantity of oil, at any place, and at any time.   Under the ruling of the court below, the plaintiff could have as readily recovered for loss of profits on olive oil, as coal oil ; for the profits of ten thousand gallons of oil, as for the profits on one.   The defendant might have come prepared with testimony as to the value and quantity of one kind of oil, and yet have been surprised by an inquiry as to another kind or quantity.   "A chief object of formal written pleadings is, to apprise the opposite party of the real cause of complaint against him, so that he may in like manner interpose the proper answer on his part, and that on the trial he may not be taken by surprise; this requires that the injury complained of should be stated with such fullness and certainty in the declaration as to leave no reasonable doubt of the particular transaction on which the plaintiff relies, and which he intends to prove to establish his right of action.   These are common-place principles and apply to every pleading which is required to be special in its nature."   *Relyea* v. *Drew*, 1 Denio, 563.

But, granting that the declaration was sufficiently specific in all these points, was the plaintiff entitled to recover damages for the loss of profits he might have made had the dispatch been delivered, and the oil been sent and received in Denver, and sold ?   In the case of *Staats* v. *Executors of Ten Eyck*, 3 Caines, 116, LIVINGSTON, J., says: "The safest general rule in all actions on contracts is to limit the recovery as much as possible to an indemnity for actual injury sustained without regard to the profits, which the plaintiff has failed to make, unless it shall clearly appear from the agreement that the acquisition of certain profits

depended on the defendant's punctual performance, and
that he had assumed to make good such a loss also." To
the same effect is *Thompson* v. *Shattuck*, 2 Metc. 618.
In the case of *Freeman* v. *Clute*, 3 Barb. 426, HARRIS, J.,
says : " The defendants insist that if liable for consequential
damages at all, they are only liable for such expenses as
were actually incurred by the plaintiff in attempting to put
the machinery in operation, and such actual loss as he had
sustained in using the defective machinery ; while on the
other hand the plaintiff claims that he is entitled to recover,
as consequential damages, the profits he could have made
in the manufacture of oil had the machinery been complete
and put up within the time limited. I agree with the coun-
sel for the plaintiff in the general rule for which he contends,
that the party complaining of the breach of an executory
contract is entitled to indemnity for the loss which the non-
performance of the obligation by the other party has
occasioned him, and for the gain of which it has deprived
him. But the gain contemplated by this rule is only that
which is the direct and immediate fruit of the contract, such
gain may as properly be regarded in estimating the damages
resulting from a failure to perform a contract as any actual
loss the party may sustain. But even the civil-law rule,
which is more liberal than the common-law, in the measure
of damages for the violation of an executory contract, con-
fines the allowance for the loss of profits to the particular
thing which is the object of the contract, and does not
include such loss of profits as may have been incidentally
occasioned in respect to his other affairs. I cannot agree
with the counsel for the plaintiff that the estimated profits
upon the manufacture of a specified quantity of flax seed
into linseed oil constitutes a legitimate item of damages
against the defendants ; such profits are entirely too specu-
lative and uncertain to make them a measure of damages."

The same rule is laid down in *Blanchard* v. *Ely*, 21
Wend. 342. In the case of *Driggs* v. *Dwight*, 17 Wend.
71, and *Millers* v. *The Mariners' Church*, 7 Greenl. 51, it
was held that the plaintiffs were entitled to recover the

expenses actually incurred in their business *as a conse-quence* of the failure of the defendants to perform their contract, but denied their right to recover damages for prof-its, which they claimed they might have made.   Mr. Justice STORY, in the case of *The Schooner Lively*, 1 Gallis. 315, commenting on this subject, says : "Independent, however, of all authority, I am satisfied upon principle that an allow-ance of damages upon the basis of a calculation of profits is inadmissible.   The rule would be in the highest degree injurious to the interests of the community.   The subject would be involved in utter uncertainty.   The calculation would proceed upon contingencies, and would require a knowledge of foreign markets to an exactness in point of time and value which would sometimes present embarras-sing obstacles.   Much would depend on the length of the voyage and the season of the arrival.   After all it would be a calculation upon conjectures and not upon facts."   In the case of *Griffin* v. *Colver*, 16 N. Y. 490, the earlier New York decisions are reviewed with great care, and the con-clusion reached is that the party injured by a breach of contract is entitled to recover all his damages, including gains prevented as well as losses sustained, provided they are certain, and such as might naturally be expected to fol-low the breach.   They exclude only uncertain and contin-gent profits, not such as, being the immediate and necessary result of the breach of contract, may be fairly supposed to have entered into the contemplation of the parties when they made it, and are capable of being definitely ascertained by reference to established market rates.   POTHIER says : " In general, the parties are deemed to have contemplated only the damages and injury which the creditor might suffer from the non-performance of the obligations in respect to the particular thing which is the object of it, and not such as may have been accidentally occasioned thereby in respect to his other affairs.   This rule, however, applies only to cases where, by reason of special circumstances, having no necessary connection with the contract broken, damages are sustained which would not ordinarily or naturally flow from

such breach; as when a party is prevented by the breach of one contract from availing himself of some other collateral and independent contract entered into with other parties, or from performing some act in relation to his own business, not necessarily connected with the agreement. An instance of the latter kind is, when a canon of the church, by reason of the non-delivery of a horse pursuant to agreement, was prevented from arriving at his residence in time to collect his tithes. In such cases the damages sustained are disallowed, not because they are merely consequential or remote, but because they cannot be fairly considered as having been within the contemplation of the parties at the time of entering into the contract." After examining at great length the various decisions on the subject, SELDEN, J., remarks: "From these authorities and principles it is clear that the defendants were not entitled to measure their damages by estimating what they might have earned by the use of the engine and their other machinery, had the contract been complied with. Nearly every element entering into such a computation would have been of that uncertain character which has uniformly prevented a recovery for speculative profits."

In the case of *Squire et al. v. Western Union Telegraph Company*, 98 Mass. 232, and which was an action in tort for failing to deliver a message, BIGELOW, C. J., says: "These rules, in their application to damages in actions of this nature, are well settled and familiar. A party who has failed to fulfill a contract cannot be held liable for remote, contingent and uncertain consequences, or for speculative or possible results which may have ensued on his breach of duty, although they may be traceable to that cause. The reason is, that damages of such a nature are not the natural or necessary incidents of a contract, and cannot be deemed to have been within the contemplation of parties when they agreed together. A rule of damages, which should embrace within its scope all the consequences which might be shown to have resulted from a failure or omission to perform a stipulated duty or service, would be

a serious hindrance to the operations of commerce and to the transaction of the common business of life. The effect would often be to impose a liability wholly disproportionate to the nature of the act or service which a party had bound himself to perform and to compensation paid and received therefor. The practical rule, founded on a wise policy, and, at the same time, consistent with good sense and sound equity, is that a party can be held liable for breach of contract only for such damages as are the natural or necessary and the immediate and direct results of the breach, such as might properly be deemed to have been in contemplation of the parties when the contract was entered into, and that all remote speculations and uncertain results, as well as possible profits and advantages, and other like consequences which might have arisen from the fulfillment of the contract, must be excluded, as forming no just or legitimate basis on which to determine the extent of the injury actually caused by a breach."

While in this cause the court disallowed the recovery of profits, it held that the defendants, as a contracting party, were liable for the injury actually caused by their breach of duty, and commenting on the opinion delivered by himself in *Elis* v. *American Telegraph Company*, 13 Allen, 226, remarks: "There is nothing in the nature of the business, which they undertake to carry on, that should exempt them from making compensation for any neglect or default on their part." There is another important case bearing on this subject, and one worthy of great attention, as it seems to have been ably argued by counsel and gravely considered by the court. I refer to the case of *Leonard* v. *The New York Telegraph Company*, 41 N. Y. 565. The facts in that case were as follows: On the 24th of September, 1856, Magill & Pickering, acting for plaintiffs, delivered to the Western Union Telegraph Company, at Chicago, a dispatch to be sent to one Shoals, at Oswego, as follows: "D. B. Shoals, Oswego. Send 5,000 sacks of salt immediately. Magill & Pickering." When the message was delivered, it read, "Send 5,000 casks of salt immediately." The term

"sacks," in the salt trade, designates fine salt, containing fourteen pounds, and the term "casks" designates coarse salt, in packages containing not less than 320 pounds. Shoals received the telegram on the day it was sent, and that evening chartered a schooner to take the salt to Chicago, and shipped by her 2,733 barrels of coarse salt. The cargo of salt arrived at Chicago on the 15th day of October. There being no market for the same, it was stored away at the expense of the plaintiff. The salt was worth, at the time of its shipment in Oswego, $1.60 per barrel. The cost of transporting the same to Chicago, exclusive of insurance, was nearly twenty-seven and a half cents per barrel, and on its arrival at Chicago it was not worth at that place to exceed $1.25 per barrel.

The cause was tried before a referee, who found "that the measure of damages to which the said plaintiffs are entitled is the difference in the value of salt at Oswego and Chicago with the cost of transportation added thereto, with interest from the time of the arrival of said salt at Chicago." On commenting on this finding of the referee, EARLE, C. J., says : "The measure of damages to be applied to cases as they arise has been a fruitful subject of discussion in courts. The difficulty is not so much in laying down rules as in applying them. The cardinal rule undoubtedly is, that one party shall recover all the damages which has been occasioned by the breach of contract by the other party. But this rule is modified in its application by two others. The damages must flow directly and naturally from the breach of contract, and they must be certain both in their nature and in respect to the cause from which they proceed. Under this latter rule, speculative, contingent and remote damages, which cannot be directly traced to the breach complained of, are excluded ; under the former rule such damages are only allowed as may fairly be supposed to have entered into the contemplation of the parties when they made the contract, as might naturally be expected to follow its violation. It is not required that the parties must have contemplated the actual damages which are to be

allowed, but the damages must be such as the parties may fairly be supposed to have contemplated when they made the contract. Parties entering into contracts usually contemplate that they will be performed, not violated. As both parties are usually equally bound to know and be informed of the facts pertaining to the execution or breach of a contract which they have entered into, I think a more precise statement of the rule is, that a party is liable for all the direct damages which both parties to the contract would have contemplated as flowing from its breach if, at the time they entered into it, they had bestowed proper attention upon the subject, and had been fully informed of the facts. * * * I think, therefore, that the rule of damages adopted by the referee was sufficiently favorable to the defendant. The damages allowed were certain, and they were the proximate and direct result of the breach." As to the measure of damages that may be recovered in an action of tort, or for breach of contract, I call attention to the cases of *Shepard* v. *Milwaukee Gas Light Co.*, 15 Wis. 325; *Railroad Co.* v. *Howard*, 13 How. (U. S.) 344; *Masterton* v. *The Mayor, etc., Brooklyn*, 7 Hill, 61; *Fox* v. *Harding*, 7 Cush. 522; *Thompson* v. *Jackson et al.*, 14 B. Mon. 114; *Davis* v. *Talcott*, 14 Barb. 611; *Wade* v. *Leroy et al.*, 20 How. 24; *Waters* v. *Powers*, 20 Eng. Law and Eq. 410; *Fletcher* v. *Tayleur*, 33 id. 187; *Alder* v. *Heighly*, 16 M. & W. 117.

If the authorities from which I have quoted state the rule correctly, and I have no reason to doubt it, then the instruction given by the court, so far as the same relates to the plaintiff's right to recover for profits which he might have made had the message been delivered and the oil sent, etc., is erroneous, and the jury having been misled by it, the cause must be reversed. And as this cause must go back for trial, it is proper that we should add that the plaintiff is entitled to recover not only what he paid the company for transmitting the message, but also the increased price of freight he was required to pay, and also all expenses that the plaintiff incurred by reason of the failure of the defend-

ant to fulfill the contract. The length to which the opinion has already grown prevents reference to other matters that have been assigned for error.

The cause is remanded for new trial in accordance with the principles announced in this opinion, and the parties have liberty to amend their pleadings.

*Reversed.*